Welcome to the Fifth Circuit. I hope everyone didn't have to work too much over Labor Day weekend. As you can see, we've got Judge King next to me on my right, participating from Houston, and Judge Duncan and I will handle the three cases we have today. So I will call the first case of the day, 17-10165, United States of America v. Gentry, et al. I think Mr. Stolarski? Stolarski? Is that correct? Stolarski? Thank you. Anytime you're ready. Good morning. May it please the Court. My name is Shane Stolarski and I represent Appellant Charles Bounds. Our primary concern in this appeal is whether the trial court erroneously denied a motion to substitute counsel for the lack of a good cause. We believe the record sufficiently demonstrates an irreconcilable conflict between defense counsel and his attorney, as well as a complete breakdown in communications that warrants a new trial. Do you agree that our law requires you also to show prejudice, that there was an unjust result? Yes, sir. Okay. And so just zeroing, because your time, everyone's time is limited, zeroing in on that, I thought Judge McBride here said that the attorney was experienced, he always did communicate, and the impasse that they experienced was pretrial, but not much has been pointed to in trial to show that an unjust result came from this challenging relationship they had. What's record evidence as to an inability to sort of have a just result at trial would be great? Well, I think it's two-part. I think the pretrial issues impact the ultimate trial result, because if you look at what went on pretrial, it was a lack of communication. And so who is the most important party in this? It's the defendant. He holds knowledge about key witnesses, evidence, possible reasons to impeach credibility of the other people testifying at trial, and if there's no communication, how does defense counsel know what paths to go down? And we know, I believe it was at that last pretrial motion withdrawal right before trial on April 29th, defense counsel acknowledged that the defendant had a list of witnesses that he wanted in a complaint. And see, we know there's people out there, but at that time, trial counsel had built a barrier between him and his client saying, I am only going to communicate, am I at the point with my relationship with this client where I only can communicate in writing or in court, which is a handicap. He acknowledged it was a handicap. But again, if you could, because time is so short here, point to the any evidence during the trial that the two of them couldn't communicate. Was there any outburst then or any further grievance? Any outburst. And I know there's defense counsel made some objections during trial. But then if you look at the nature of his opening and closing, it was basically very brief. It was my client had a drug issue. There's witnesses with serious credibility. You'll find him guilty. That was it. That was the same as his closing. Right. He presented no witnesses. He presented and gave the defendant no opportunity to testify. We know the defendant basically did the defendant who was fairly vocal and clearly confident speaking to Judge McBride, which takes some audacity, did he ever then say, I have witnesses or I didn't get the discovery I want? Not during trial. That was all pre-trial. I think I don't mean to rush you, but I think your 3C1.1 argument at sentencing is a very difficult one. So my question there is, is that issue purely one of fact and clear error review? Judge McBride used the word impede and therefore end of story. We have to find that that's clear error? Or what is your argument, because there's very little case law about a defendant who keeps saying, I just want good counsel, then having that characterized as obstruction of justice? There's no case law directly on point on that. But are we reviewing for clear error? Because he did use the word impede the administration of justice. Yeah. But I think there is a fact inquiry there because, yes, it is clear error. But this— So what can you point to in the record that shows clear error on that determination? When you look at the nature of what—I think if he gave the lawyer the benefit of the doubt in what his statements were that this was—he was generally moved by what was going on. So it was obvious that what was going on was truthful, that this was not a ruse to just get the trial date changed, get a different lawyer. So there was—he was being genuine, and he believed there were genuine reasons for— Doesn't it look like, I mean, understandably, he just got impatient at the end? The district judge? Yes. That's your— This is a bigger issue because this case was fast—it was from indictment to trial was six months. The attorney-client relationship only lasted five. And basically three-fifths of those months were spent locked head-butting over discovery. The lawyer had sent an email, apparently, that my client construed as accusing him of already found him being guilty. And so there was this distrust from the beginning. And so here we are. He's going into trial with someone that tells the court, I'm going to put my interests first. And how can we— The lawyer said he would put his interests first? Is that— Yes. He made four statements. That was after the— That was the— —claim was filed by— That was in his final motion to withdraw that after the grievance was filed, he made the four statements. I'm going to put mentally and psychologically incapable of putting my interests or my client's interests before mine. I'm being neutralized as an advocate. So I think he's acknowledging that this has impaired his ability. Are you — you tell me, would you agree that if a defendant just kept filing last-minute frivolous motions to get new counsel, or even in the middle of trial, that that could justify an obstruction of justice enhancement? Yes. So it's just a question of degree. Right. And here, the degree— You can see that even in the face of Application Note 2 of the guidelines. It says the enhancement's not intended to punish the defendant for the exercise of a constitutional right. It's a matter of does he believe he was trying to reasonably exercise his constitutional right. Okay. And so I think the facts here show that he was being reasonable. Because— I think the red light's on. You probably reserve time for rebuttal. It's a difficult issue. Thank you, counsel. Okay. Mr. Harris. And you represent Mr. Skaggs. No, Judge. I represent Billy Fred Gentry. Oh, Gentry. Gentry. I'm sorry. Yes. Okay. And must please the Court, I was the trial attorney in this case. And speaking as a CJA panel attorney, I accept the fact that juries determine guilt, but not quantity in Federal drug cases. Yet I have a hard time accepting the fact that we're supposed to treat the quantities that the DEA drafts in these report of investigation like it's— Did you get access to the DEA-3? Did you—was the report that was given to probation given to you? Yes. Yes, it was. And in it, they interview Hawkins, and she attributes the larger amount. She attributes a tremendous amount to Billy Fred Gentry III. And basically, while there's other areas, there's five main points I want to raise of why I think this is questionable, why this amount should— Five points. Okay. Five of them. I'll try to hit them quickly. I mean, number one, Shonda Hawkins, the main person with the main amounts, I talked to her attorneys. They described her to me as a young woman, a drug addict who engaged in sex acts and various drug dealing to support her habits. I doubt very seriously she engaged in general accounting. This is probably outside the record, what they told you about her. Yes. What they told me was outside the record. Did you—I mean, I don't see you making a Rule 32 argument that you—once you saw this enormous enhancement based on her, you wanted her at the sentencing hearing. Did you say to the judge, we need to traverse her? No, Judge. I did tell Judge McBride that I felt like she was an unreliable witness. And another thing, the main point that shows that she's unreliable is there was a long period of time where she was saying that Billy Fred Gentry III making drug purchases when he was obviously, according to records, in the Tarrant County Jail on a completely unrelated incident. Well, on that point— That shows by itself that she's unreliable. On that point, Mr. Harris, wasn't there an addendum to the PSR that attempted or that sought to correct that problem? The response that the government had was that they said, well, we'll take that period of time that he was in custody and we will subtract that from the overall amount. My position is, how can they say that she is a reliable witness when it's so obvious that she's wrong on this count? I mean, because obviously, he could not have been making purchases of methamphetamine while he was in the Tarrant County. About how much of the total amount attributed to you at first in the original PSR was impossible because of the incarceration? I can't say based on it, but basically, the amount they alleged, it's our position, it should have been 5 to 15 kilograms. Right. The total amount that was attributed to him was over—it was 24 kilograms. Unfortunately, in these drug cases, it often is true that persons have been in jail. It's quite remarkable. There's an established body of case law about, well, if they were in jail when drugs are being attributed to them, and my read of that case law, in particular a case I don't think cited, but you may have seen it, called Rogers, our court, says one correction that's reasonable is just cut out the time they were in jail. Give the person the drugs that they weren't, cut out the part. Now, if that case law exists, what's your answer to that? Well, Jeff, that's the sole indication. And also, Judge, I'd like to point out that recently there was a significant opinion that was rendered by the Third Circuit Court of Appeals last year, U.S. v. Douglas. The side on that is 885 F. 3rd 145. And in that case, the Douglas court said that the drug quantity estimates based solely on a single drug addict witness was not sufficiently reliable. Okay. The difficulty there is the government hasn't heard that citation. It was a year ago. I know, I mean, new cases come up, but we haven't read it. They haven't read it. And you had it a while ago. That would be really helpful. This is a tough issue. But anyway, there it is. Okay. And so the Third Circuit, you're telling us, says once the probation department relies on some other third person, that's not reliable? They said a single drug addict witness. Yeah. And in the Billy Fred G. 3rd's case, there were other witnesses that said he made purchases. There was only one witness that he actually made a delivery to them. But I would also point out that at the trial, one of the witnesses said the amount listed in the DEA report was not accurate. In addition to that, Billy Fred G. 3rd's father, Billy Fred G. 3rd II, was a major player in the drug business in the area. They have the same name. How do we know that these witnesses did not get the two of them? Once it's in the addendum, the PSR, you need to say, Your Honor, we need an evidentiary hearing. Don't you? Isn't the burden on you to rebut that? Well, I thought I did request an evidentiary hearing. Oh, you did? And Judge McBride, his exact words were, this is a broadside objection. He said there was no indication, the information relied on, and the PSR was not reliable. No, I agree. But I didn't read your brief to be saying that the error here was that he didn't hold a Rule 32 evidentiary hearing. I don't think I specifically cited a rule. Yeah, or even that it was an abuse not to have an evidentiary hearing. At least, I'll reread the brief. But it's a difficult issue. Okay, counsel. Thank you. You probably have rebuttal time reserved. Yes, Judge, I would like to reserve rebuttal. Just final point I'd like to say is that these reports are drafted by the DEA. Shawna Hawkins was not called to testify as a witness at the trial. She had already been sentenced. She was in federal custody. It was very easy for them to have transported her to the courthouse to testify, yet the U.S. Attorney's Office chose not to call her. So that by itself is another indication of why she's not reliable. Thank you. Attorney Bunch for Mr. Skaggs. And please support. My name is Trey Bunch, and I represent Billy Skaggs. Given that Mr. Skaggs was appointed counsel under the Criminal Justice Act, Issue 1 contends that the trial court abused its discretion in denying Mr. Skaggs' request for funds to be used for investigative services. As stated by the Aiki Court, when a governmental entity brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. Clearly, Aiki and the cases that follow it require more than a mere request for services, however. An indigent requesting services must also demonstrate specific need for a basic tool. In this case, the trial court stated that it had never in 26 years granted a request for investigative services. While the appellant concedes that the right to investigative services is not warranted in many circumstances, it is certainly warranted more frequently than never. Was the essential reason here that the attorney didn't want to go to McKenzie's house because there were security concerns? The attorney was me, and yes, that was one of the reasons. Okay. That was one of the reasons. There were other reasons. What's the most salient justification? Was it that? That was one of them, yes. One of them, okay. That could not be done for security purposes. I did try to contact her by other means, which is in my brief, by phone and bio. And what's the closest circuit authority that an attorney's utterly understandable apprehensions about going somewhere justifies appointment and payment for an investigator? What's the best case that shows that that type of triggering circumstance? I believe, I don't know that there is one. I believe Williams versus Stewart, which is cited in my brief, does make reference to a similar situation. Okay. Great. Go ahead. Appellant Skaggs made two requests for investigative services. The initial request was denied without hearing, but the second request in the hearing that followed described specific relevant material tasks to be undertaken by an investigator and the specific government evidence to which those tasks pertained. When an attorney is appointed in a criminal case, that attorney undertakes to retrieve and review evidence and to interview the defendant and other witnesses in formatting a defense. In this case, it was apparent that Witness McKenzie was a crucial witness in building a defense for Mr. Skaggs. McKenzie was Skaggs' girlfriend and the person closest to him. She is the person who would have been able to inform the jury of his daily activity, his travel habits, who he came in contact with, and in what activities he was involved. She could have corroborated or rebutted fine detail of his daily activity during the relevant 27-month time period. Her confirmation of details could have exposed inaccuracies in the testimony and proffer notes of other witnesses, potentially leading to a different outcome for Mr. Skaggs at trial. Prosecution involves a similar process as that undertaken in formulating a defense, that is, retrieving evidence, interviewing witnesses, and so on. But in prosecution of cases, investigation techniques are utilized from the inception. Imagine if somehow a court stripped the government of its investigative resources. Prosecution of cases would not be possible. Among the many reasons that law enforcement investigation is necessary in criminal litigation is the fact that the investigator can testify to the findings of the investigation at trial, whereas counsel cannot. The record reflects that McKenzie refused to speak to you. She insisted that you come to her house? No, I was not able to reach her by phone. She had, I think, her account or her phone was disconnected. There was no indication whether or not to her willingness to speak with me. You also have an evidentiary argument, and just quickly on that, two questions. Did you get a mere presence instruction in this case? And then secondly, I thought that there was a witness named Judge who implicated your client in meeting with one of the name suppliers in the indictment. There was a witness named Judge who was, which is another issue in my brief about— Government witnesses named Judge. I'm sorry. No, no, no, go ahead. About the court not allowing me to fully cross-examine Ms. Judge. Yeah, but Judge Higginson's asking about the evidentiary point, I guess, the denial of your Rule 29 motion. Oh, yes. Right, and so I think his question, I certainly had a question about it. Didn't Jessica Judge have testimony that links Skaggs and Audra Bowen? I believe so, yes. Okay, and so we have to look at the evidence, obviously, in the light most favorable to the verdict. Yes. Okay. The practical restraint on articulating a more specific need in a pretrial motion or ex parte hearing is the fact that much of the information gathered at the inception of a defense investigation comes directly from the defendant. Those communications are, of course, privileged, and their specific disclosure to a court, even in an ex parte setting, is prohibited by rules of professional responsibility. The government asserts that the application was too broad, when, in fact, it was not broad at all. The application was a five-page document outlining specific need for an investigator with specific tasks to be undertaken. Great, and you reserved some time, too? Yes. So final counsel for the four defendants who are appearing here, Mr. Smythe for Ms. Michael Heaslett. Yes, Your Honor. May it please the Court, good morning. My name is Peter Smythe. I represent Michael Clay Heaslett. What we've presented to the Court in terms of issues is the Fifth Amendment, Sixth Amendment clash that occurred at the trial. Our contention is that Leslie Holliday, the government's witness, illegitimately invoked the Fifth Amendment after answering certain questions of the government regarding her past criminal history on direct examination. But, I mean, just again, because time's short, don't we have to cut to the chase here and say, under Restivo, did the jury still perceive your challenge to her credibility? And were you trial counsel? No, I was not. Whoever was, I mean, pretty much destroyed her. Got out 20 convictions, 50-plus pages of rap sheet. How could you really impeach a person more even if then she said, I'm not going to answer, and her attorney said, I won't answer about the fake ID conviction or exposure? A couple of things to respond. One, Restivo, Davis, Rocha, Roussel, the cases that the government relies upon, those are cases where the district court prematurely cut off cross-examination without any witness invoking the Fifth Amendment. I think the proper analysis is Fountain v. United States, and that is a different standard. And the standard is whether or not the defendant's inability to make the inquiry created a substantial danger of prejudice. Now, she did have 20 prior felonies, credit card abuse, but that was eight years before. What defense counsel tried to drive into is she was recently arrested before trial. In fact, this is just a year after the conspiracy. And the government actually asked her questions about that, about the arrest, about methamphetamine in her hand, in her car. But then it went on because the government wanted to neutralize that testimony. And then with defense counsel, when defense counsel said, well, there's not just methamphetamine in your hand. There was a fake ID in your car. Well, then she invokes the Fifth Amendment. When you say in your brief, Doss, that whole lines of questioning were foreclosed. Yes. What's the record site to show that you were stopped from asking about anything but the fake ID? Or are you saying that is the error, exploring more the fake ID exposure? Well, from the record as I see it, counsel wanted to ask her about the fake ID. Right. And then she invokes the Fifth Amendment. And then later on in the record, where is it, 1261 to 64, defense counsel kind of presents some other questions regarding the fake ID. But actually, I think in the context. But did defense counsel ever ask a question unrelated to fake ID and the district court said you can't go there? I don't think so. And certainly I don't see a proffer where the response was, okay, if we can't go there, this is what we thought we would be able to explore. I think that's what we see in 1261. The thing is with the Sixth Amendment and criminal defense counsel, I mean, once this witness invoked the Fifth Amendment, the district court, instead of being the restivo or the other courts where it's active, it was passive here. And it said, well, I guess she will follow her lawyer's advice and just kind of let it go. But at that point in time, defense counsel stymied because what are these unrelated cases? I mean, what are these cases that she is pleading the Fifth on, that she has given bits and pieces to the government in order to gain a lower sentence? But then it's an open question. In fact, I think between the government's brief and our brief, we can't tell whether there are two arrests, one arrest, two charges or more charges than that. And the bottom line is this, when you get down to the Fountain case, was the defendant able to test the truth of her direct examination testimony? And we say no. It sounds like restivo. I really don't. I'm not sure I'm perceiving the distinction. Were you able to sufficiently show the jury her credibility? Test the truth, but anyway. Well, as I see the line of cases, you have the Fountain case where a witness is invoking the Fifth Amendment, and the question is whether or not that's legitimate. And our argument is it was not legitimate since she opened herself up on direct, including the proffer agreement. With restivo and Roussel and the rest, you had the district court that is basically shutting down defense counsel on its own without a witness claiming the Fifth Amendment, but the district court saying, well, you've gone this far, and I'm not going to let you go any further. And that seems to be a different standard. Because here, in this case, we do not have. Yeah, no, that's helpful. And time's up, but I appreciate it. We'll hear from the government, and then we'll hear rebuttal arguments. Excuse me. Judge King, can you still hear all of us? Ah, I was worried. You may be muted on our end, so do you mind? Everything is coming through just great. Wonderful. And we can hear you. Thanks for being there. Ms. Falconer? You have 30 minutes. All right. May it please the court. Emily Falconer for the government. I'd like to begin with a 3C1.1 issue with respect to defendant bounds. Just to address a couple of the questions that were raised. Judge Higginson, you asked whether there is the circuit case law to support applying this enhancement simply because the defendant repeatedly filed motions looking for a new attorney. So the short answer is none that I'm aware of. The longer answer is, and this goes to Judge Duncan's question about the guideline commentary about the enhancement being inappropriate where a defendant has invoked a constitutional right. So what we have here went far beyond simply filing motions for a new attorney. That was certainly part of it. The district court made extensive findings. These are, you can see them in multiple places in the record. One is... Before we get to the findings, it is in your brief, there were no cases cited that none for 3C1.1 other than standard of review. And you're then openly indicating you found none. That creates a worry for me. In other words, if there is not a single case out there where a defendant's sort of repeated effort to get better counsel suddenly brings on him an enhancement because he obstructed justice, my thought is then, well, let's look at the rule. And the question I'll ask you is, does enhancement here fit any application note? Is it even — I mean, his conduct to me looks less egregious than the application note examples for where the sentencing commission tells us you shouldn't apply the enhancement. I can't see any application note that's similar to a person who counsel is concurring for months has an impasse. So it actually — we disagree that it's far less egregious than what you have in the guidelines, commentary, and comment four, because part of the court's findings was that he made repeated false statements to the court, not only once but twice. Okay, well, you're right. Falsity is an element in those applications. So give the best record site to where Judge McBride said your assertion was a false one. Yes. So two sites. Okay. Two record sites. So one is page 3410, and that is at the — sorry, that's the hearing itself. The actual site of where he made that finding was around page — I'm sorry, I don't have the record. It's in the normal case. Because I know his statement, his conclusion, I find he impeded. But I didn't see that Judge McBride ever said this was a lie, this was false. And it seems doubtful he would have said so because the attorney was concurring with it all. Correct, Your Honor. But he wasn't aware at the time, at the time the statement was made, that it was false. Now, that you can see on page 34 — around page 3410 of the record. That is the hearing — I believe it's the second hearing when he calls everybody in and says, all right, what's going on between you guys? Let's try to work this out. You think when I look at that hearing, I will see a finding that the defendant was making false statements? He did not make a finding that day, Your Honor, because the false statement that he made that day was to represent to the court, oh, yes, everything's fine. Our disputes worked out. You know, going forward, we're good. When, in fact, he had that morning filed a bar grievance against his attorney. So it was, I guess, perhaps not a false statement, but more of a material omission. Maybe the — I don't know how you look at it. But once we move to material omission, then it doesn't look like the application notes. Application notes is you get enhanced when you do something criminal or when you lie. So they go further than that, Your Honor. What's your best — give me the closest application note to what happened here. So the closest applications would be false statements. And, again, it was a — we contend that it was a false statement that he had worked out. I know you contend that, but you said to me a minute ago there were two findings where the district court said it was false. And yet I'm not hearing a record cite to either of those findings. Well, Your Honor, the district court's finding of the false statement was approximately — now, this is in a hearing, so it's approximately around this page, 1576. 1576, okay. This is where Judge McBride made extensive findings about all of the different ways in that Defendant Bounds was, through his conduct, seeking to delay the proceeding. One of them was making false statements. And that — you will see that hearing around, again, page 3410. That's an earlier hearing. Now, of course, Judge McBride did not find at that time it was false. He didn't know — that was the point. He didn't know about the bar grievance. So with respect to your questions of the examples from the guidelines that are the most similar, um, so in Comment Note 4, B and E both involve false statements to the court. Yeah. Another one, which is not as obvious, but if you look at the Greer case, which we cite in our brief — and you're right, we did cite it in the standard of review section — but if you look at the facts of Greer, this court, by analogy, found that when a defendant is — I believe in Greer, the defendant had feigned incompetence to stand trial. It was basically pretending to be crazy. Right. That crosses the line. You see, what I'm struggling here is, let's say you prevail, and we have to write a rule of law that tells district judges whenever they see a defendant doing the following, they're actually obstructing justice. But we wouldn't want to write a rule that says if a defendant's just uninformed and saying, I want to testify or I want a good counsel, you — I think you'd agree, but don't agree lightly. That would never trigger it. So do you accept my — this will be my question. Do you accept that we have to find that Judge McBride found that he was lying about needing better counsel, that it has to be a false statement to be an obstruction? Or can it just be repetitive demands that are denied, and then that's really bothering the court? What would you say? And is there case law? I sort of prefer false criminal to just being obstreperous and not understanding from jail, angry, last-minute, okay, I've had enough, that's obstruction. So I'm not aware, Judge Higginson, of any case law that says that just repeatedly — just repeatedly filing motions alone is enough to support the enhancement. And we're not asking the court to hold that today. Okay. What we have here is repeatedly filed motions that the court repeatedly found to be frivolous. In addition, the court found that this conflict of interest with the attorney was something that was deliberately — he specifically made this finding, and again, you'll find this in the record around page 1576, that specifically Mr. Bounds contrived this dispute with his attorney. It's not just that he wants a new attorney. He's mad that his attorney wouldn't, you know, make an argument that he wanted. Or, you know, just the typical things that you see when people say they want a new attorney. It was certainly the repeated filing, the fact that it was a contrived grievance. Additionally, this is something that's not in our brief. It was not part of — Let me just sort of add, I think — well, I'm trying to — I have the same concerns that Judge Higginson does. At ROA 652, Judge McBride — and I don't know what the context of this site is, but ROA 652, Judge McBride talks about an attempt by Bounds to manipulate his right to counsel. And I wonder if you could explain to me what it — beyond making false statements, what did — what do you think Judge McBride had in mind there to manipulate the right to counsel, almost to use the assertion of a constitutional right strategically in order to obstruct the proceedings? So, the — right, I believe what Judge McBride was referring to with the manipulation of the right to counsel was essentially that the claims he was making were not — you know, wanting the discovery materials. It's not that he wasn't given access to the discovery materials. He wanted discovery materials related to other defendants in his prison cell. He wanted to keep them. And something that gives color to this dispute, which perhaps wasn't part of Judge McBride's findings, but this Court can, of course, affirm on any ground that finds support in the record. Wait, what did you just say? Something that was not in — I believe the Court can affirm the enhancement on any ground that finds support in the record. So we would point to another fact in the record that was not part of Judge McBride's findings, but that absolutely, at a minimum, gives color to what this dispute was that was going on, is that we have testimony from a witness at trial, that's Gavin Shulka, that Mr. Bounds actually did put his hands on some of the discovery materials that — not through his attorney, not through Mr. Danielson. We don't know how he got it, but he had a witness report, because this case was built on the testimony of cooperating witnesses, and that Mr. Bounds and others nearly killed that fellow inmate, and that he testified, Gavin Shulka testified, that he was called back and found him — found Mr. Bounds standing there holding — This isn't in the brief, right? It's not in the brief, because it was not part of Judge McBride's findings. But it's an additional support that the Court could rely on. But, you know, our contention is that that's not required. But it also does — Wait, I'm sorry. But it also does — You're saying the trial — counsel, when asked a question, stop. You're saying that in this trial record, there's evidence that Bounds wanted to kill a witness? He did, in fact, almost kill a witness, yes. Gavin Shulka was the witness. Why would Judge McBride not — how could that possibly not have been observed and support an obstruction of justice? I don't have an answer for that. I mean, I don't have an answer for why that wasn't something he relied on. Did the government — I think — but the idea is that — and I raise this point only not as an independent ground, not saying the Court should affirm, saying that, you know, by trying to make a witness unavailable, I'm not asking the Court to affirm on that independent ground. That's a whole different world than what we're talking about, which is a really difficult rule of law to construct. If it's repetitive frivolous from an uninformed person who doesn't want to go to jail for life, to me, I don't see that as obstruction of justice. If he lies, manipulates, contrives, that seems pretty solidly in the world. Now, if he's going to kill somebody, well, of course. But we have to decide what Judge McBride attributed — what conduct did he attribute the misconduct to. And I think the middle you're saying exists. Manipulation, false statement, contrive, those are findings Judge McBride made. Yes. Okay. And so my argument in bringing up this other witness is that I believe that is why Judge McBride, in knowing the record as he did, found that he was manipulating his right to counsel, that it wasn't actually about him wanting the discovery material so he could participate wholeheartedly in his own defense. And at any rate, Judge McBride also, he had been advised multiple times that no attorney was going to be able — because there was a discovery agreement with government — that no attorney was going — he had been repeatedly informed of this — was going to be able to give him those discovery materials in his cell. So he was aware. He was made aware of that on multiple occasions. Where in the record, where did you refer to this attempt to kill an eyewitness? Did you give us a record site? That is in the testimony of Gavin Shilka. I'm sorry. What's the name of the witness? Gavin? Gavin is the first name and the last name is Shilka, S-H-U-L-K-A. And I can possibly find that. Well, you've — So I'm sorry, Your Honor. I'd be happy to submit that later to the Court. That's all right. But he testified that. He testified that he was a number of fellow inmates, members of the Aryan Brotherhood attempted to kill him in prison, and that when that incident happened that he was brought into another room and Mr. Bounds was standing there holding a witness statement. And again, we're not claiming that was the basis for this enhancement in particular, but I do believe that in response to Judge Duncan's question that this is possibly part of what Judge McBride had in mind, at least at the sentencing phase, about why he was — So if you were writing our opinion to affirm, but to be very sensitive of defendants who are terrified they'll go to jail for life, and so they are filing crazy motions, how would you write the rule? You would affirm Judge McBride's determination here. How would you write that? I think the false statements are a key portion. I think the repeated false statements to the Court were really distinguish this case from your run-of-the-mill case where someone just repeatedly files motions, maybe misguidedly, as Judge Duncan said, you know, might want to testify or, you know, invoke a constitutional right otherwise. The problem with that is, I mean, if the quotes are there, then it's largely a fact determination. The reason I'm doubtful that they're there, but you represent that they are, is that the attorney never said, Your Honor, as an officer of the Court, we've been communicating fine. This is a ruse. Instead, the attorney seemed to validate throughout, right to the end, like we have a problem. I can't talk to the guy. He's grieving against me. I don't remember the attorney who's respected by Judge McBride saying, This is concocted. So he did. He did when those false statements were made. Now, we have multiple. I'm going to, if the Court would allow me, cite a few different portions of the record. There are a few different hearings here that are relevant. And the relationship between Mr. Bounds and his counsel changed quite a bit to the point you get to right before trial with him saying communication is broken down, you know, and I. The best cite would be the attorney saying, This is made up, Your Honor. This is not true. Anything close to that. So we don't have him saying, This is made up. I know. Anything close to that. Repeatedly saying that they had resolved their differences and that Mr. Bounds agreeing with that. So we have June 17, 2016. Um, we, uh, counsel files a report to Judge McBride saying that he had met with Bounds, that they had, that he walked away from the meeting feeling they had resolved his differences. The same day, um, Bounds filed a motion to the Court to dismiss his counsel. So the Court sets that for hearing. Um, on July 1st, a hearing is held. This is page 535 to 536 of the record. Counsel explains that they had essentially resolved their differences and Mr. Bounds specifically told the Court that the conflict was a misunderstanding and that they had resolved their differences. That's July 1st. But if a, if, if a defendant's filings are a misunderstanding, that would be exactly what we would protect. That isn't a lie. It's a misunderstanding. Right. Okay. Right. But he said that it's a misunderstanding. Then you have him though continue with these continual, these continual appearances. So, you know, that happens on July 1st. Then Danielson tells the Court later that he, on July 15th, met with Mr. Bounds. Bounds refuses to discuss trial strategy. Storms out of the room. Will only fixate on this. I want the discovery materials. I want the discovery materials related to all of the defendants. And Bounds never contests that that's what he wants. That he wants discovery materials related to defendants other than him. He wants all the witness statements. That he wants to keep them in his cell. He wouldn't, he never at any point during this dispute said, oh no, that's not really what this is about, and really I just think my attorney's not that smart. Or, oh, I think my attorney's not handling this case right. This was really what it was about, and Bounds agreed to that repeatedly at every point in the record. Now, Counsel, I'm going to move you to the other big issue we explored with defense counsel, just because of time. You can come back to this. But my concern about the drug amount attribution is one way of seeing it is, oh, well, this happens every single drug case. It's a clear error determination. District courts assess amounts. This case is different, though. Here's why, but disagree with any of the following propositions. The government charges just one count, a conspiracy count, no substantive counts. Then there's no 404B about drug amounts. There's no special verdict asking the jury to find drug amount beyond a reasonable doubt. There's no evidence taken at sentencing. So what we end up having is a single count with no trial determination of amounts, but the defendants getting immense sentences based only, as I see it, on probation, saying we've seen something else, not related to the charged conduct, from a cooperating witness. And then it turns out everyone agrees, both as to Gentry and Kelo, that person trying to seek favor with the government is impossibly wrong as to large amounts of the drug amounts. And yet we still, the law says we still have to say, oh, that's reliable enough to put him in jail for that conduct that wasn't ever determined at trial, and probation just said it was. Is that the logic of the government's argument? So we disagree, first of all, that everyone agrees that these witnesses were impossibly wrong with respect to the drug quantity. So with respect to Mr. Gentry, there was, and again, you have some of these witnesses giving statements, giving interviews, some numbers. This was a years, multi, multi-years long drug conspiracy and investigation that went on for a number of years. So sometimes we do have a couple of witnesses who were off as to their dates. Now, with respect to Mr. Gentry, it's largely— That's what I call impossibly wrong. That's what I would call impossibly wrong. If the person was in jail— Sure. Okay, well— It doesn't mean that they were wrong as to the fact that these quantities of drugs were ever exchanged between these two individuals. They were wrong about the date on which it specifically happened. Now— That's a total guess, and these people have never appeared anywhere. In other words, what troubles me is the law that says you can charge something, prove no drug amounts, not even 404B, to a preponderance, not beyond a reasonable doubt, then you get to sentencing. You don't even put a witness on to be cross-examined at sentencing. Instead, you give a probation officer a document you say is from someone cooperating elsewhere, and suddenly that's what he goes to jail for? Well, that is what the law— Okay. That is the law. That is the law. Okay. So then what's the best law when you add to that that it turns out the witnesses you're relying on, Ms. Hawkins, let's focus on Hawkins as to Kelo, she's wrong, impossibly wrong. We're just going to say, well, she must have meant, or whoever it was, as to Kelo. We just — we're going to say they must have meant the time when he wasn't in jail? So it's — that was Alicia Priest, that witness. Yeah. So she was wrong about her dates, and we admitted that. I mean, that was pointed out in a written objection at sentencing. We admitted that she had to have been incorrect about her dates. However, there was — we provided additional other evidence corroborating that this activity did, in fact, happen. Do you have to show, when you do that, do you have to show from evidence that is not within that date range that the amounts attributed to Kelo, you know, are sufficiently reliable? Because it's a lot with respect to Kelo. It's 54 kilograms. It is a lot. And Kelo was absolutely — he was himself involved with huge transactions. Those are the transactions we're talking about here. That's from paragraph 14 of the PSR. That's Alicia Priest's statement. So he was there with someone named Eloy Salas, who's — in the original PSR is an unnamed person, but then later is named, I think, in the briefing of the district court. But — so he — Salas was a big-time dealer, right? So Kelo's role — so you have — and then you see other paragraphs of the PSR where you see Kelo doing smaller exchanges, you know, still distribution quantities, but not these multi-kilogram quantities. But — so with respect to that statement about when Kelo and Eloy Salas were coming and doing that breakdown at Alicia Priest's house, the government provided additional witness statements — so in our sort of briefing in response to the PSR — that showed that, okay, that activity was actually — Salas and Kelo were working together in the fall of 2000. So I believe it was fall — she said December 2014 to April 2015. So we put forward additional witness statements showing that, look, Kelo and Salas were working together, clearly not on the date she remembered because he was incarcerated for part of that time, but we have additional witnesses saying, no, when they were working together was actually just a few months before. And if we knock her off completely, you're saying those witnesses independently get to the drug amount attributed to him? Or do we somehow still have to rely on Priest? No, they don't get to those quantities. But, Your Honor, we would — That's the problem. — we would object to knocking her out completely because she misremembered the dates. I mean — Well, she's off by 70 percent almost. Seventy percent of what she attributes to him he couldn't have done. With respect to that individual date range. But, I mean, unless we believe that her being confused about the dates means that she's fabricating the fact that they came to her house multiple times a week. But it's so easy for the government to put evidence that's relevant to a conspiracy on a trial, and then people are under oath and cross-examined, and juries make specific findings. Happens all the time. But when the government elects not to put it on trial, there's nobody under oath, no one cross-examined, and they don't do it at sentencing. All they do is hand it, a DEA report, to a probation officer, and then it turns out they were totally wrong as to 70 percent. Why would we ever credit that other person that's never been cross-examined saying must have meant different dates? Why? What law says that? So what I hear in your concern, Judge Higginson, is a concern to some extent about the state of the law. No. My question is, how can we say cooperating Ms. Priest trying to get favor elsewhere, we're just going to think she meant another date? She never said that. Her dates were quite specific in that report. We're just going to say, well, she's totally wrong as to that, but she must have been right about the drugs. Some other time must have happened. Yes. Supported by corroborating evidence. So she said, look, he is — and so Kelo's role — there was extensive trial testimony, actually, about Kelo's role in the conspiracy, what he was doing. He was muscle. He was an enforcer. So he would go with Eloy Salas. You know, she says in her statement, which we submitted, that he always had a weapon. The people brought him along because he was big. He was a scary-looking dude. And he — they would come to her house to break down methamphetamine for distribution. We have other witness statements saying, yeah, these guys were working together distributing methamphetamine around this time. I mean, unless you believe that her being wrong about the dates necessarily means that she's also wrong that they were working together when other people said that. I mean, again, this is a factual finding. With respect to Kelo and this error, did the government file an addendum to the PSR admitting the error and offering an explanation to correct it, as it did with respect to Gentry? Yes. Okay. Where do I find that in the — so I can find that in the record. So we did not — with Gentry, I believe that what the PSR addendum did was essentially just subpoena. Yes. It was a relatively small quantity. With Kelo, that didn't happen because Elisha Priest was sort of one of the biggest witnesses against him. And so let me — let me point you to a record site, though, on the addendum, our response, and the sentencing hearing there. What's the — while you're looking for it, what's the best circuit authority that will still deem reliable a PSR reference to cooperators who didn't ever show up at trial when they're wrong as to anything significant? Can you think of a — can you give me a single case that says that? So, I don't have one off the top of my head, Your Honor. I mean, I think there's frequently — I mean, to some extent, when the government is limited in the time it has at trial, and all we have to prove at trial — I mean, this is kind of the problem that you're pointing to, but the conspiracy charge was conspiracy to distribute. This happens in almost every drug case. Well, we're not trying to help the government out here. Statutory requirement. No, no, I'm not — this isn't a problem. I don't — I don't see it as a problem. I see the government can easily correct it. They prove it at trial to beyond a reasonable doubt, or even 404B preponderance. Jury makes a specific finding. Nothing needs to happen at sentencing. Sentencing's already a problem when you put people in jail based on evidence proven to a preponderance. Then we have even further, it isn't even proven at sentencing. It's proven in a DEA-3. And now it turns out the DEA-3 is wrong. So I'm asking you, is there any circuit law anywhere that says you can still put someone in jail based on reports given to probation that are proven wrong in any significant part? Can you find a case that says that PSR is still reliable enough to put someone in jail based on it? I mean, I don't have one off the top of my head. I'd be happy to submit some additional authorities, but it seems to me that what you're gesturing towards is a straightforward, unless I'm misunderstanding, a straightforward Apprendi issue. That, I mean, I don't even know how we would ask the jury to find that because it's not an element of the offense. I'm not sure that, I mean — Were you charged more than — unknown more than 50, right? I mean, the indictment did describe an amount as attributable to the conspiracy. Well, the statutory — I mean, the statutory — Not the statute. What you charged. No, I mean, to the extent that we — again, I have not researched this in the context of this case. It wasn't really presented, but if we were to include a greater amount in the indictment, I mean, I don't know why the government would undertake to — the burden of proof beyond a reasonable doubt at trial on something that the statute does not give us that burden on. I mean, we proved at trial what we had the burden to prove. And then at sentencing, I mean, it's just long established that, you know, if it's not an element of the offense, it can be proved by a preponderance of evidence at sentencing. I mean — And, Ms. Falconer, just so I understand what we're doing here, we're reviewing whether the district — whether there was sufficient indicia of reliability in the PSR with respect to the drug quantities for Kelo and Gentry. Under clear error. And that's why I asked about the addendum with respect to Gentry, because there's an explanation for the error. There's a subtraction of amounts. And I understand that. And that may or may not give us sufficient confidence. But with respect to Kelo, what I'm getting at is that it seems different to me. So here are the relevant record sites. The government's — the objection itself, that is pages 5023 to 5024 of the record. The government's response, which begins at page 4925. The PSR addendum, which is at page 5015. And importantly, attached to the government's response, Alicia Priest's actual statement. That's at page 4933. So just one last point we would want to make about that is that the minimum required amount that needed to be reached by proponents of the evidence for the base offense level 38, which he received, was 45 kilograms. The next level down requires only 15, which is a much smaller amount. Now, Alicia Priest's statement establishes that, you know, they came. They broke this amount down. He was always — he was an enforcer. He was always carrying a gun. Again, this is page 4933. At least 20 to 30 times. So even if you estimate extremely conservatively based on that — say her dates are wrong, how much can we trust our — in addition to the other quantities listed in the PSR, he easily gets to 15. So the remedy here, if the court feels that the evidence was insufficient, should be nothing more than a remand for sentencing at base offense level 36. Because there's plenty of evidence established in this record. At the sentencing hearing, testimony from the case agent, in addition to these slides that I just gave, to get him to 15. And there would be no need for a full-scale resentencing hearing. He could just be resentenced at base offense level 36, the next level down. Thank you. And we would otherwise ask the court — the court affirm in all respects. Thank you. Thank you. Thank you. Each of you just has a few minutes. May it please the court. The burdens on the government when it comes to these enhancements to prove that they apply. The probation office, when they initially created the report, didn't apply the enhancement. They only did so after the government moved for it. And it was based on what they concerned were these falsehoods. But when you look at the examples in the guidelines about what kinds of falsehoods require the enhancement, it's materiality. Repeatedly, F, section F. Counsel did say when we look, we'll find that Judge McBride made findings of falsity and contrived. But falsity is not enough. Falsity, if it looks like the other — Well, suppose we think it is. What if we looked in the record? Are we going to find that there are findings that Mr. Bounds lied, for lack of a better term, about his assertions to the court with respect to getting one in new counts? Material falsity. Well, so suppose we disagree. That's a legal point. What about the factual issue? Yeah. I think the first two citations that they cited to where she lied were from — or where Bounds allegedly lied were from the original new trial request in June. But those, even the judge acknowledged, that was a misunderstanding because the defendant himself said, I'm redrawing him. It was a misunderstanding. The judge is on the record saying, give him a chance. There's times where you think it's a conflict and it's nothing more than a misunderstanding. So he gave him the benefit of the doubt early on. Later, what upset the judge, I think, was that grievance. But the parties agree. The trial court didn't know about it. Defense counsel didn't know about it. Defendant, when asked about it, he's like, I don't know why I didn't tell the court. So he had no idea it was going to have an impact or that it was important to tell the court. I don't think that could be used against him to say he was trying to delay the proceedings with that grievance. About the discovery, the only reason he wanted a discovery was because on July 29th, he said to the court, I want this so I can determine whether I exercise my right to trial or to plead guilty. There is no evidence he wanted that discovery for any other purpose. Thank you, counsel. Thank you. Mr. Harris. Yes, Justices. I think we can all agree there's issues with Shonda Hawkins' reports going to the DEA. Now, in the trial, my memory, of course, this was four years ago, there were three witnesses who showed up, testified that Billy Fred Jutri III purchased drugs from them. There was one witness that testified, made delivery to them. I'm just, because your time's short. You did get the Hawkins DEA III, so you could have said, we want her here at sentencing because we think we can impeach her. The argument, I don't see it in the brief, is that it was error to deny your opportunity to cross-examine her. And then it is true as to Gentry that the probation said, we will not count any of the drugs when he was in jail. How is that not sufficient to make what was left reliable? Well, that means she didn't testify at trial. There was no documentation, no support. I know. This interview wasn't even recorded. All we have is a summary drafted by the DEA. But government counsel's right. That's the law. The issue is, was she then shown to be unreliable? Probation says, yes, so we won't count it. Isn't that, why would we not find that, therefore, no harm, no foul? Well, like I said, I just recently discovered the Douglas case that I previously cited that came out. I have another case if y'all want me to cite that one. But that just came out very recently. All right. Give us the site. You should file a 28J, right? What's that? You should file a 28J letter for new authority. OK. You should have, because then Ms. Falconer could have read it, and we could have read it. But anyway, the other one, go ahead and give it to us. Yes, it's U.S. versus Walton. That is 908 F. Second. OK, you can stop right there. F. Second? Yes, Judge. So it didn't just come out? That one did not just come out. All right. Well, then, I think that's fine. I will rest on the Douglas opinion that just recently came out. All right. Thank you, counsel. As to the issue of the denial of the investigator, under these circumstances, suggest that detail, in addition to what was provided as necessary for an indigent movement to receive the assistance of an investigator, would require counsel to either somehow predict the future outcome of the investigation or to disclose confidential information as to the nature of the investigation that's received from a client, an attorney-client communications. In practices, the standard which the government argues that a movement must show to demonstrate a specific need under ACI is unworkable, if not impossible, given the realities of criminal trial representation. Judge McBride's been around a long time. He's got a good feel for when counsel need help. And in this case, he was pretty solicitous, right? He let you come in and explain a second time. He did let me come in and explain. But he stated in that hearing in 26 years, he's never granted a request for an investigator. That's a good response. Okay. Well, again, I'm going to ask you the question I asked you before, so the answer may be the same. What's the closest case? Because it's a tough issue when defense counsel say, I just wish I could have more money. I can't do this. I need an investigator. But it's a finite pool. So when has any circuit court said a district judge committed reversible error by denying it? I guess you gave me one before, and you think that's the closest? Yes, and those cases are tough to come by when in regards to investigators. There's very few out there. It's a tough issue, and you've pressed it well. Thank you, counsel. Thank you. Unless the court has any questions for me, I can give my time back to the court. Oh, my goodness. Well, thank you very much. And I think that concludes it. I've been known to cut things off ahead. Thank you. I think you're all court appointed and government counsel also on the public dime. So thank you. Very big case, and I appreciate your responses to our probing questions. We'll call the next case of the day, 18-10931.